IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| CHARLA R. POWELL, ) | Civil Action No. 3:10-975-DCN-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL SECURITY ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the Court pursuant to Local Civil Rules 73.02(B)(2)(a) and 83.VII.02, et seq., DSC, concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB").

## **ADMINISTRATIVE PROCEEDINGS**

Plaintiff applied for DIB on October 24, 2005, alleging disability as of January 1, 2002. Plaintiff's application was denied initially and on reconsideration, and she requested a hearing before an administrative law judge ("ALJ"). A hearing was held in August 2008, at which Plaintiff and a vocational expert ("VE") appeared and testified. The ALJ issued a decision dated December 24, 2008, denying benefits because Plaintiff could perform her past relevant work as a parts manager.

Plaintiff was fifty years old at the time of the ALJ's decision. She has a high school equivalency degree (GED) with past relevant work as a collections worker, parts assistant, and parts manager. Plaintiff alleges disability due to back impairments, arthritis, asthma, fibromyalgia, and a blood disorder. Tr. 105.

The ALJ found (Tr. 12-18):

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2002.

2. The claimant did not engage in substantial gainful activity during the period from h[er] alleged onset date of January 1, 2002 through h[er] date last insured of March 31, 2002, according to the claimant's testimony (20 CFR 404.1571 *et. seq.*).

3. Through the date last insured, the claimant had the following severe combination of impairments: back disorders/degenerative disc disease, arthritis and asthma (20 CFR 404.l521 *et seq.*).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform medium work with no concentrated exposure to fumes, odors, gases dust and poor ventilation as defined in 20 CFR 404.1567(c) or to lift/carry fifty pounds occasionally and twenty-five pounds frequently as well as sit and stand/walk six hours of an eight-hour workday. The undersigned determines that the claimant is able to occasionally climb ramps/stairs as well as stoop and is never able to climb ladders/ropes/scaffolds. The undersigned also concludes that the claimant is frequently able to bend, crawl, kneel and crouch.

6. Through the date last insured, the claimant was capable of performing past relevant work as a parts manager. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from January1, 2002, the alleged onset date, through March 31, 2002, the date last insured (20 CFR 404.1520(f)).

On March 17, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (Tr. 1-3). Plaintiff filed this action on April 20, 2010.

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

## MEDICAL EVIDENCE

Plaintiff has sought treatment for back pain (with radiation into her legs) since at least 1993. Tr. 333. In March 1993, a CT scan of her lower back revealed a herniated disc at the L5-S1 level of Plaintiff's spine, with compression of the left S-1 nerve root. Tr. 361. In April 1993, Plaintiff reported an increase in pain while bowling. Dr. Robert Flandry, of Spartanburg Neurological, performed surgery on Plaintiff's lower back for a herniated disc with S-1 radiulopathy on the left side. Tr. 216-220. Plaintiff initially reported improvement following surgery, but complained that her symptoms returned in August 1993. Tr. 214-215. An MRI was ordered, but it showed that the nerve root was in its normal position, with no evidence of recurrent or residual disc herniation. Tr. 214, 360.

Plaintiff reported increased pain in February 1994, however an MRI of her lower back was negative for disc herniation. Tr. 211, 359. A subsequent epidural block provided "considerable

relief." In March 1994, Dr. Flandry noted that Plaintiff was "quite flexible," with an improved range of motion in her back and a normal gait. Tr. 210.

Since at least June 1997, Plaintiff has been treated for asthma. Dr. G. S. Bailes advised Plaintiff to quit smoking and prescribed an inhaler. Tr. 332-333. In June 1998, Plaintiff had bronchitis and experienced an exacerbation of her asthma in relation to the bronchitis. Dr. Gulzar Merchant adjusted Plaintiff's medication and Plaintiff reported she was doing much better in July 1998 with no complaints. Tr. 325, 328-330. In September 1998, Dr. Merchant noted Plaintiff had gastroesphageal reflux disease ("GERD"), but was "doing well" with treatment. Tr. 323-324.

On November 2, 1998, Plaintiff complained about back pain. Dr. Merchant noted recent weight gain and assessed Plaintiff with obesity. He noted that Plaintiff stopped smoking and her asthma was under good control. He prescribed Meridia for weight control and advised Plaintiff to exercise. Dr. Merchant also diagnosed Plaintiff with depression and prescribed an anti-depressant medication. Tr. 323.

In May 1999, Plaintiff reported to Dr. Bailes that she was no longer experiencing shortness of breath and had stopped taking her medication for asthma. She complained of knee and ankle pain. Dr. Bailes recommended that Plaintiff take Advil and lose weight. Tr. 331.

In February 2000, Plaintiff complained to Dr. L. Breeden Hollis, Jr., a neurologist, of neck pain and numbness in her hands. Dr. Hollis noted that Plaintiff was alert and oriented, with normal comprehension, full range of motion in her neck, full 5/5 strength in her arms and legs, normal muscle bulk and tone, intact sensation, and a normal gait and tandem gait. Tr. 334-336. A nerve conduction study of Plaintiff's left arm was reportedly within normal limits. Tr. 337.

On January 23, 2001, Plaintiff was examined by Dr. W. John Henry, III. She reported she had vertigo, neck and shoulder pain (which she said had been present for two months), and GERD. Tr. 177, 340. An MRI of Plaintiff's neck revealed "very minimal spondylitic disc protrusion at C4-5, C5-6, and C6-7, with no evidence of nerve root impingement. Tr. 341. An MRI of Plaintiff's brain revealed non-specific findings. Tr. 176, 341-242. Dr. Henry assessed Plaintiff with headaches and osteoarthritis in her neck on February 26, 2001. Tr. 176.

Plaintiff's asthma was exacerbated by a cold in March 2001. Tr. 175. On April 4, 2001, Dr. Henry noted that Plaintiff's asthma improved with treatment. Tr. 173. In June 2001, Plaintiff reported that her insurance company was no longer covering physical therapy, and that her back and neck symptoms had worsened. She reported headaches which Dr. Henry thought were muscle tension headaches. He prescribed muscle relaxants and an anti-depressant. Tr. 172.

In July 2001, Plaintiff returned to Spartanburg Neurological. She reported back pain (which radiated into her right leg and was aggravated by increased activity, prolonged sitting, and prolonged standing) and neck pain (which radiated into her shoulders and arms). Plaintiff complained that she experienced headaches (associated with neck pain) on a daily basis. Physician Assistant Chal Mills noted that Plaintiff's asthma and GERD were well-controlled with treatment. His examination revealed that Plaintiff had mild tenderness in her neck, but had "relatively full" movements in all directions (without reports of increased pain). He was unable to reproduce Plaintiff's reported radicular symptoms. Mr. Mills wrote that Plaintiff stood with a normal station, had a full range of motion in her back, normal gait and tandem, normal deep tendon reflexes, intact sensation, and intact motor strength. Straight leg raise tests were negative. Tr. 206-209. On August 1, 2001, it was noted that x-rays and an MRI of Plaintiff's cervical spine revealed degenerative changes at several levels,

but "no frank cord or nerve root compression...at any level." Tr. 205, see also 168-170. Lumbar study showed post-operative scarring at the left S-1 root, but no significant disease at any other level. Dr. Flandry discussed epidural blocks and physical therapy with Plaintiff. Tr. 205.

It was noted in September 2001 that Plaintiff had significant reduction of her back and leg symptoms after an epidural block. Dr. Flandry noted that Plaintiff remained "quite active despite her discomfort." Plaintiff continued conservative treatment, which included epidural injections. Dr. Flandry diagnosed lumbar degenerative disc disease and post-operative changes at L5-S1 without evidence of obvious neural compression, and mild multi-level cervical degenerative disc disease in her neck. Tr. 203-204.

On November 7, 2001, Plaintiff reported that her most recent epidural block did not provide her with any "real relief." Tr. 202. A discogram of Plaintiff's lumbar spine was positive at L5-S1. Tr. 201. Plaintiff also sought treatment for GERD on November 29, 2001. She said that her GERD symptoms were exacerbated by her asthma medication, but that medication helped relieve her symptoms in the past. Dr. Henry provided samples of the medication. Tr. 186.

Dr. Flandry performed surgery (anterior lumbar interbody fusion at L5-S1 using a prosthetic cage) in December 2001. Tr. 349-350. In January 2002 (the month she alleges she became disabled), Dr. Flandry noted that Plaintiff's surgical incisions had healed nicely, she walked comfortably in her back brace, and straight-leg raise testing was negative. He directed Plaintiff to gradually increase her activities, and instructed her to return in four weeks. Tr. 200.

On February 12, 2002, x-rays of Plaintiff's lumbar spine revealed minimal upper lumbar scoliosis, with a surgically-implanted prosthesis at the L5-S1 level. Tr. 348. The next day, Dr. Flandry noted that Plaintiff was doing quite well, and had not taken analgesic pain medication for

at least several weeks. Plaintiff reported that she had mild tingling in her left thigh, but denied significant leg pain. She continued to wear a back brace during weight-bearing activities. Dr. Flandry instructed Plaintiff to gradually increase her walking. Tr. 199.

On March 19, 2002, Dr. Flandry wrote that Plaintiff continued to do "very well overall, with no significant lumbar or lower extremity pain." Plaintiff used muscle relaxants only rarely and took Celebrex on an occasional basis. Dr. Flandry noted that he would begin to wean Plaintiff from her back brace, and she would begin physical therapy. Tr. 198.

On June 13, 2002 (approximately three months after Plaintiff's last date insured), a physical therapist noted that Plaintiff was responding well to therapy and her strength and flexibility were increasing. She also, however, noted that Plaintiff's pain was increasing and was 4 or 5/10 most time and 7 to 8/10 at times. Tr. 179. On June 18, 2002, Dr. Flandry noted that while Plaintiff had "minimal" discomfort following her December 2001 surgery, she currently reported increased discomfort in her lower left buttock and thigh, as well as diffuse numbness and tingling from her lower back into her left leg with prolonged sitting. On examination, Plaintiff walked with a deliberate, but non-antalgic gait, and had "relatively full" movement in her trunk without a significant increase in discomfort. Dr. Flandry adjusted Plaintiff's medication and noted that inflammation of Plaintiff's sacroiliac joint (connecting the lower spine and pelvis) needed to be ruled out. Tr. 197. A steroid injection on the left side of Plaintiff's sacroiliac joint was administered on July 12, 2002. Tr. 347.

In August 2002, Plaintiff reported an increase in neck pain and headaches which she reportedly had for a long period of time. She said her neck pain worsened when she sat at her computer all day, or did work requiring head movement. Dr. Flandry opined that Plaintiff took

7

arthritis, GERD, and asthma medication on a daily basis, and headache medication on an as-needed basis. He assessed her with cervical osteoarthritis (spondylosis) with neck pain (cervicalgia) and headaches (cephalgia), possibly related to degenerative disc disease. Tr. 196. On September 11, 2002, Dr. Flandry noted that x-rays of Plaintiff's neck (Tr. 344-345) revealed moderate to severe degenerative disc disease, with no nerve root compression. Dr. Flandry noted that surgical procedures would not likely improve Plaintiff's symptoms (including headaches which were reportedly "now becoming daily"). Tr. 194-195.

Plaintiff was seen for an initial evaluation with Dr. Carol Kooistra on October 10, 2002. Plaintiff weighed 209 pounds. On examination, Plaintiff demonstrated intact higher cortical functions, cranial nerves, motor function, sensation, reflexes, cerebellar function, and gait. Dr. Kooistra assessed her with cervical myofacial pain syndrome, with cervical disc disease and gynecomastia (enlarged breasts) as contributing factors. She adjusted Plaintiff's medication and noted that Plaintiff might benefit from breast reduction surgery. Tr. 315-316. Plaintiff reported continuing headaches on October 31, 2002. Dr. Kooistra adjusted Plaintiff's medication and prescribed physical therapy. Tr. 314.

In November and December 2002, Plaintiff complained that her GERD was worse and she was referred to a gastroenterologist. Tr. 185-186. After a January 2003, endoscopy, Dr. Joseph LeBel noted that Plaintiff's GERD was resolved. Tr. 370. On February 27, 2003, he noted that Plaintiff's GERD was controlled with medication. Tr. 369.

Plaintiff was also referred to a plastic surgeon in December 2002 for possible breast reduction surgery. See Tr. 185, 377. She underwent such surgery in April 2003. See Tr. 312, 376.

Plaintiff continued to receive treatment from Dr. Kooistra through December 2007. Tr. 298-309. In June 2003, Dr. Kooistra observed that Plaintiff was "doing reasonably well...with about a 50% improvement" of her neck pain with new medication. Tr. 312. In February 2004, Plaintiff reported that Botox injections helped her neck symptoms. Tr. 309. In October 2005, Plaintiff complained of weakness in her ankles and feet, but a neurological examination was normal. Lyrica was prescribed for fibromyalgia. Tr. 303. Dr. Kooistra observed that Plaintiff retained normal strength and reflexes in January 2006. Tr. 302.

On September 1, 2006, Plaintiff reported worsening headaches, and worsening neck and shoulder symptoms. Tr. 301. In September 2007, Dr. Kooistra completed a form indicating that she saw Plaintiff about three times a year, and Plaintiff's prognosis was "fair." Dr. Kooistra opined that Plaintiff experienced daily headaches, and her symptoms would "frequently" interfere with Plaintiff's attention and concentration. She thought that Plaintiff could occasionally lift up to ten pounds, could sit for a total of four hours and stand/walk for a total of less than two hours in an eight-hour day. Tr. 293-297. In response to a question asking for the earliest date that these diagnoses and descriptions of limitations applied, Dr. Kooistra wrote "10/2002." Tr. 297.

On December 20, 2005, State agency physician Dr. William Crosby reviewed Plaintiff's medical records and opined that, during the relevant time period, Plaintiff had the functional ability to perform a range of medium work. Tr. 221-228. State agency physician Dr. Hugh Clarke reviewed the evidence and affirmed this assessment on April 21, 2006. Tr. 243.

**HEARING TESTIMONY**

At the hearing before the ALJ, Plaintiff testified that she became unable to work on January 1, 2002, due to headaches and back pain. Tr. 36. She said she had difficulty sitting and standing. She reported she continued to experience pain after her 1993 and 2001 surgeries. Tr. 43-44. Plaintiff said that she had pain which radiated from her arms into her neck, with numbness and tingling in her arms. Tr. 45-46. She said a doctor told her that additional surgery on her cervical spine would not cure her headaches or resolve her neck complaints. Tr. 45. Plaintiff said that breast reduction surgery helped relieve some of the pain in her neck and shoulders. Tr. 50.

Plaintiff reported she had tension headaches which waxed and waned in severity over the course of a day, and did not completely resolve with pain medication. Tr. 42. Botox shots helped the headaches, but her insurance no longer paid for the shots. The headaches reportedly impacted Plaintiff's vision and made her sensitive to light and noise. Tr. 43. Plaintiff said she experienced vertigo, sometimes once a week and sometimes once a month. Tr. 41-42. Plaintiff reported difficulty concentrating due to her medication. Tr. 50. She said she was five feet four inches tall and weighed 230 pounds. Plaintiff testified that her weight impacted her breathing and mobility. Tr. 35.

Plaintiff said she lived with her husband, sister-in-law, and four dogs. Tr. 40. On a typical day in 2002, she woke up around 9:00 a.m., let the dogs out, returned to bed, got up again at 10:00 or 10:30 a.m., ate breakfast, did "a little bit of housework" such as laundry, decided what to prepare for supper, and laid down on the sofa to read or watch television. Tr. 47-48. She estimated that she spent more than half the day lying down. Tr. 47. Plaintiff reported that she had a driver's license and drove on a regular basis. Tr. 35. She bowled "at times," but had to change her bowling style and was no longer competitive. Tr. 54.

Plaintiff estimated that she could lift up to fifteen pounds, sit for about two hours at a time (while shifting positions), and walk for about an hour at a time (for example, at the grocery store). Tr. 51-52. She said she had difficulty squatting and tilting her head. Tr. 52-53. Plaintiff testified that she could not perform a seated job which required her to use her hands and arms. Tr. 53.

Plaintiff testified that at her prior job as a parts manager, she was in charge of ordering and stocking parts and was responsible for inventory. Tr. 38-39. She had to lift five gallon bucks of fluid (which weighed approximately 60 pounds). Tr. 39.

## **DISCUSSION**

Plaintiff alleges that: (1) the ALJ failed to properly evaluate the opinion of her treating physician (Dr. Kooistra); (2) the ALJ's determination that Plaintiff's functioning improved after her December 2001 back surgery is not supported by substantial evidence; (3) the ALJ failed to properly evaluate her impairments of chronic headaches and depression; (4) the ALJ erred in relying on the opinion of non-treating, non-examining physician Dr. Crosby because Dr. Crosby did not review all of the relevant records; and (5) the ALJ failed to properly evaluate her obesity. The Commissioner contends that the determination that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence[1] and free from harmful legal error.

---

[1]Substantial evidence is:
> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

11

      A.      <u>Treating Physician/Opinion of State Agency Physician</u>

Plaintiff argues that the ALJ erred in discounting Dr. Kooistra's opinion and relying on the opinion of Dr. Crosby. The Commissioner argues that the ALJ reasonably discounted Dr. Kooistra's opinion and properly relied on Dr. Crosby's opinion.

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. <u>See</u> 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2); <u>Mastro v. Apfel</u>, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." <u>Craig v. Chater</u>, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." <u>Mastro v. Apfel</u>, 270 F.3d at 178 (citing <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527. Social Security Ruling ("SSR") 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p.

The ALJ's decision to discount Dr. Kooistra's opinion is supported by substantial evidence and correct under controlling law. Contrary to Plaintiff's argument that the ALJ did not reference the applicable law, the ALJ stated that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." Tr. 14. He specifically discounted Dr. Kooistra's opinion of disability because Dr. Kooistra first saw Plaintiff six months after Plaintiff's date last insured such that the opinion did not establish that Plaintiff was disabled prior to March 31, 2002. Dr. Kooistra's opinion was also discounted because it was not supported by the bulk of the medical evidence or by Dr. Kooistra's own medical records Tr. 16.

Plaintiff argues that the ALJ erred in relying on Dr. Crosby's opinion because it was dated December 20, 2005, but a lot of Plaintiff's medical treatment information was not a part of the record at that time. The Commissioner argues that the ALJ reasonably gave weight to Dr. Crosby's opinion because it was consistent with the evidence regarding Plaintiff's condition during the relevant time period.

The ALJ's decision to assign significant weight to Dr. Crosby's opinion (Tr. 17) is supported by substantial evidence and correct under controlling law. See 20 C.F.R. §§ 404.1527(f)(2) and 416.927(f)(2); SSR 96-6p ("Findings of fact made by State agency ... [physicians ]... regarding the nature and severity of an individual's impairments must be treated as expert opinion of non-examining sources at the [ALJ] and Appeals Council level of administrative review."). As noted by the ALJ, Dr. Crosby's limitations are consistent with the medical records. Although Plaintiff argues that certain records were not before Dr. Crosby, she fails to provide any basis for her assertion as to records which predated Dr. Crosby's opinion. Those records which postdated Dr.

13

Crosby's opinion (December 2005) are not pertinent to the relevant time period. Further, Dr. Clark concurred with Dr. Crosby's opinion following his review of the record in April 2006. See Tr. 243.

B.    Mental Impairment

Plaintiff alleges that the ALJ erred in failing to properly evaluate her mental impairment and resulting functional limitations as required by 20 C.F.R. § 404.1520A. The Commissioner contends that the ALJ properly evaluated Plaintiff's mental impairment by rating Plaintiff's functioning in each of four areas and determining that Plaintiff's depression resulted in no limitation in activities of daily living, mild limitations in social functioning, mild limitations in concentration, persistence, or pace, and no episodes of decompensation. Based on this, the Commissioner argues that the ALJ properly found that Plaintiff's depression was not severe.

The ALJ's analysis of Plaintiff's depression and determination that it was non-severe is supported by substantial evidence. The ALJ specifically considered Plaintiff's depression under controlling law. See Tr. 4. Plaintiff, who did not receive any treatment for depression during the relevant time period, simply fails to show that any mental impairment affected her ability to perform work during the relevant time period.

C.    Headaches

Plaintiff alleges that the ALJ failed to address her chronic headaches and their effect on her ability to work. The Commissioner appears to argue that Plaintiff's headaches were not a severe impairment because she infrequently sought treatment for them during the relevant time period, medication helped her headaches, and she was able to perform many activities which indicated that Plaintiff's headaches did not limit her ability to perform basic work activities.

14

It is the claimant's burden to show that he or she had a severe impairment. See Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987). A non-severe impairment is defined as one that does not "significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).   "Basic work activities" are defined as:

> The abilities and aptitudes necessary to do most jobs. Examples of these include --
>
>  (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
>  (2) Capacities for seeing, hearing, and speaking;
>
>  (3) Understanding, carrying out, and remembering simple instructions;
>
>  (4) Use of judgment;
>
>  (5) Responding appropriately to supervision, co-workers and usual work situations; and
>
>  (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b). An impairment is "not severe" or insignificant only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

Although the ALJ notes in his opinion that Plaintiff testified as to headaches that occurred daily and caused blurry vision, he does not appear to have considered whether Plaintiff's headaches were a severe impairment or the effect of them on Plaintiff's ability to perform work. There are a number of references in the medical record to Plaintiff's headaches. On February 26 and June 6, 2001, Dr. Henry noted that Plaintiff complained of headaches. Tr. 172, 176. On July 10, 2001, Mr. Mills/Dr. Flandry noted that Plaintiff had neck pain with associated headaches for the past six to

eight months. Tr. 206. Dr. Flandry noted that Plaintiff suffered from chronic headaches that were becoming daily on September 11, 2002. Tr. 194. Dr. Henry noted on December 11, 2002 that he had referred Plaintiff to a neurologist because of her headaches. See Tr. 185. The ALJ, however, does not appear to have considered these references to headaches. Thus, it is not possible to determine from the record whether the ALJ properly considered whether Plaintiff's headaches were a severe impairment and what effect, if any, on her residual functional capacity ("RFC").

D.      RFC After Back Surgery

Plaintiff appears to allege that the ALJ failed to consider all the relevant records in determining that Plaintiff regained the ability to perform medium work after undergoing back surgery in December 2001. The Commissioner contends that substantial evidence supports the ALJ's determination that Plaintiff regained functional ability after surgery.

It is unclear from the ALJ's decision whether he considered all of the relevant evidence in determining that Plaintiff regained the ability to perform a range of medium work after her December 2001 back surgery. Although the ALJ noted some of Dr. Flandry's treatment records in 2002, he does not appear to have considered Plaintiff's increasing pain after physical therapy began. See Tr. 179, 197.

E.      Obesity

Plaintiff alleges that the ALJ erred in failing to apply SSR 02-01p in evaluating the severity of her extreme obesity, as indicated by her weight of 240 pounds. She argues that her obesity and the impact of it on her ability to do basic work activities was not addressed by the ALJ. Plaintiff asserts she testified at the hearing that her weight hurt her breathing and her mobility, but

16

the ALJ did not address this issue. She also argues that this severe impairment in combination with her other severe impairments substantially limits her ability to do basic work functions.

Pursuant to SSR 02-1p, the ALJ must consider a claimant's obesity in making a number of determinations, including whether the individual has a medically determinable impairment, the severity of the impairment, whether the impairment meets or equals the requirements of a listed impairment, and whether the impairment prevents the claimant from performing her past relevant work or other work in the national economy. When assessing a claimant's RFC, the ALJ is to consider the "effect obesity has upon the [claimant's] ability to perform routine movement and necessary physical activity within the work environment" as the "combined effects of obesity with other impairments may be greater than might be expected without obesity." SSR 02-1p.

Here, the ALJ did not discuss Plaintiff's weight or consider whether obesity was a severe impairment. At the hearing, Plaintiff testified that she was five feet, four inches tall and weighed 230 pounds. Tr. 35. She wrote the same in an undated disability report. Tr. 104. A medical record from November 29, 2001 (just one month before her alleged date of onset) indicates that Plaintiff's weight was 224 pounds. Despite this evidence, the ALJ did not consider Plaintiff's obesity.[2]

---

[2]SSR 02-1p provides:
> The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss.

SSR 02-1p. BMI may be calculated by dividing a person's weight (in pounds) by their height in inches multiplied by their height in inches and then multiplying the result by 703. At 230 pounds, Plaintiff's BMI was 39.5 (230 divided by 4096 (64 inches times 64 inches) multiplied by 703). See, e.g., 20 C.F.R. pt. 404, subpt. P, app. 1, § 5G; National Institute of Health's BMI Calculator located at http://www.nhlbisupport.com/bmi/.

The Commissioner argues that any error is harmless because Plaintiff has not shown that her obesity exacerbated her asthma as her asthma symptoms were controlled by medication and she was able to perform many activities of daily living (the Commissioner does not address the ALJ's failure to analyze Plaintiff's obesity pursuant to SSR 02-1p). At the hearing, Plaintiff testified that her weight hurt her breathing and mobility. Tr. 35. Plaintiff told her physician in July 2001 that due to an exacerbation of asthma three years previously she had prolonged use of steroids which caused weight gain which she felt "contributed to her gradual increased lumbar area discomfort." Tr. 206. As the ALJ did not address Plaintiff's obesity, it is impossible to determine whether he complied with SSR 02-1p.

## **CONCLUSION**

The Commissioner's decision is not supported by substantial evidence. This action should be remanded to the Commissioner to fully consider all of Plaintiff's impairments, consider the effect of Plaintiff's obesity pursuant to SSR 02-1p, and to determine Plaintiff's RFC pursuant to all of the relevant evidence.

RECOMMENDED that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and the case be **remanded** to the Commissioner for further administrative action as set out above.

Joseph R. McCrorey
United States Magistrate Judge

August 22, 2011
Columbia, South Carolina